IN THE UNITED STATES DISTRICT COURT
OF THE EASTERN DISTRICT OF TEXAS
TEXARKANA DIVISION

EQUAL EMPLOYMENT          §
OPPORTUNITY COMMISSION    §
                         §
V.                       §          No.  5:05CV183
                         §
LAROY THOMAS, INC.       §

## ORDER

Before the Court is Defendant's Motion and Notice of Motion for Summary Judgment

(Docket Entry # 27).  The Court, having reviewed the relevant briefing, is of the opinion Defendant's

motion should be **DENIED**.[1]

## I.  FACTUAL BACKGROUND

This is an action under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §

2000(e) *et. seq.* ("Title VII") and Title I of the Civil Rights Act of 1991 in which the Equal

Employment Opportunity Commission ("Plaintiff") alleges Laroy Thomas, Inc. ("Defendant")

violated Title VII by subjecting Raymond Jackson ("Jackson") to a racially hostile work environment

based upon his race - African American.  According to the Original Complaint, Plaintiff seeks (1)

a permanent injunction enjoining Defendant from engaging in  any employment practice which

discriminates on the basis of race or which facilitates, condones, or encourages employees to create

a racially hostile environment; (2) an Order ordering Defendant to institute and carry out policies,

practices, and programs which provide equal employment opportunities for Jackson and eradicate

the effects of its past and present unlawful employment practices; (3) an Order ordering Defendant

to make Jackson whole by providing compensation for past and future non-pecuniary losses resulting

---

[1] On November 30, 2005, the above-entitled and numbered cause of action was referred
to the undersigned in accordance with 28 U.S.C. § 636(c) and the consent of the parties.

from the alleged unlawful employment practices including, but not limited to, pain and suffering, humiliation, embarrassment, emotional distress, anxiety, and loss of enjoyment of life, in amounts to be determined at trial; (4) an Order ordering Defendant to pay Jackson punitive damages for its malicious conduct or reckless indifference in an amount to be determined at trial; and (5) an award of costs in this action.

Ron Hayes, a black co-worker of Jackson, has also asserted a Title VII cause of action in this Court for racial discrimination against Defendant. (*See* Cause No. 5:05cv195). Dwight Harrison was the alleged harasser of both Hayes and Jackson.  The Court references evidence pertaining to both Hayes and Jackson as submitted by the parties.

## II.  DEFENDANT'S MOTION

Currently before the Court is Defendant's motion for summary judgment.  Defendant seeks dismissal of Plaintiff's claims against it, asserting Dwight Harrison, Defendant's employee that allegedly is the harasser in this case, was a co-worker of Jackson, not Jackson's supervisor, and thus Defendant can be held liable for the alleged racial harassment only if it is proved Defendant knew or should have known of the alleged harassment and failed to take proper remedial action. Defendant contends the facts in this case are undisputed it took proper remedial action immediately upon learning of the alleged harassment in question.  For this reason, Defendant maintains it is entitled to summary judgment on the liability issue in this case.

In response to Defendant's motion, Plaintiff first asserts there is no genuine issue of material facts that Harrison is a supervisor for purposes of holding Defendant vicariously liable for Harrison's alleged racial harassment of Jackson.  Next, assuming *arguendo* that Harrison is a co-worker as opposed to a supervisor, Plaintiff asserts the material facts are not in dispute that Defendant did not

2

take prompt remedial action in response to Jackson's complaints of racial harassment against Harrison.  For these reasons, Plaintiff requests the Court deny Defendant's motion.  Plaintiff further requests that the Court rule, as a matter of law, that should Plaintiff prevail at trial on the merits of its racial harassment claim, Defendant is liable for Harrison's harassment.

### III.  SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate when the movant is able to demonstrate that the pleadings, affidavits, and other evidence available to the Court establish that there are no genuine issues of material fact, and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c). The movant bears the responsibility of informing the district court of the basis for its motion and identifying those portions of the pleadings, depositions, answers to interrogatories and admissions on file, together with affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.  *Topalian v. Ehrman,* 954 F.2d 1125 (5th Cir. 1992), *cert. denied,* 506 U.S. 825 (1992).

The nonmovant is not required to respond to a motion for summary judgment until the movant first meets its burden of demonstrating that there are no factual issues warranting trial.  *Ashe v. Corley,* 992 F.2d 540 (5th Cir. 1993).  Once the movant has shown the absence of material fact issues, however, the opposing party has a duty to respond, via affidavits or other means, asserting specific facts showing that there is a genuine issue for trial.  FED. R. CIV. P. 56(e).  It is not enough for the party opposing summary judgment to rest on mere conclusory allegations or denials in his pleadings.  *Topalian,* 954 F.2d at 1131.  The nonmovant must point out, with factual specificity, evidence demonstrating the existence of a genuine issue of material fact on every component of the nonmovant's case.  *Dunn v. State Farm & Casualty Co.,* 927 F.2d 869, 872 (5th Cir. 1991).  If the

nonmoving party fails to make a sufficient showing on an essential element of his case with respect to which he has the burden of proof, the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986).  In assessing the proof, the court views the evidence in the light most favorable to the nonmovant.  *Matshusita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574 (1986).

## IV. APPLICABLE LAW

Title VII provides that "[i]t shall be an unlawful employment practice for an employer – (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin."  42 U.S.C. § 2000e-2(a)(1).  "An employer violates Title VII when the employer allows the workplace to be 'permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment[.]" *Walker v. SBC Services, Inc.*, 375 F.Supp.2d 524, 535 (N.D. Tex. 2005), *quoting Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993)(internal quotations and citations omitted).  Stated differently, "[f]or harassment on the basis of race to affect a term, condition, or privilege of employment, as required to support a hostile work environment claim under Title VII, it must be sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment."  *Ramsey v. Henderson*, 286 F.3d 264, 268 (5th Cir. 2002)(internal citations and quotations omitted).

In *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998) and *Faragher v. City of Boca Raton*, 524 U.S. 775, 807 (1998), the United States Supreme Court held an employer may be subject

4

to vicarious liability for a hostile work environment when a "supervisor with immediate (or successfully higher) authority over the employee" has engaged in the alleged harassment. "By contrast, if the harasser is an employee who is merely a co-worker (i.e., not a supervisor) of the plaintiff, 'employers are liable for a co-employee's harassment only when they have been negligent either in discovering or remedying the harassment." *Quiroz v. Ganna Construction*, 1999 WL 59836, *19 (N.D. Ill. 1999), *quoting Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027 (7th Cir. 1998).

In *Ellerth* and *Faragher*, the Supreme Court did not define what it meant by "supervisor." *Joens v. John Morrell & Co.*, 354 F.3d 938, 940 (8th Cir. 2004). Title VII provides no definition of the term "supervisor," and there is no controlling authority in the Fifth Circuit regarding the definition of "supervisor." Other circuits have construed the term "supervisor" in multiple ways. "The majority hold that, to be a supervisor, the alleged harasser must have had the power (not necessarily exercised) to take tangible employment action against the victim, such as the authority to hire, fire, promote, or reassign to significant different duties." *Id.* At least one court, the Second Circuit, has adopted a broader standard, concluding an alleged harasser is a supervisor for these purposes if he possessed "authority to direct the employee's daily work activities," even if he otherwise lacked the power to take tangible employment action against the victim. *Id., quoting Mack v. Otis Elevator Co.*, 326 F.3d 116, 127 (2d Cir.), *cert. denied*, 540 U.S. 1016 (2003).

### V.  DEFENDANTS' EVIDENCE

Defendant relies on the following evidence in support of its motion: (1) Affidavit of Laroy Thomas ("Thomas Affidavit"); (2) Deposition of Laroy Thomas taken in this case ("Thomas Depo."); and (3) Deposition of Raymond Jackson taken in this case ("Jackson Depo."). Defendant's

summary judgment evidence establishes the following.

Defendant is a mechanical contractor engaged in the business of heating/air conditioning/plumbing installation in new construction and also in the business of heating/air conditioning/plumbing service work in existing buildings. (Thomas Affidavit at ¶ 3).  In 2004, Defendant had approximately 40 employees, a little over half of which were employed in the new construction part of Defendant's business.  Defendant's new construction employees included sheet metal workers who installed heating and air conditioning equipment and plumbers who installed plumbing equipment.  (*Id.* at ¶ 4).

Laroy Thomas is President of the Company and his son, Barry Thomas, is Vice President. (*Id.* at ¶¶ 1, 5). Only Laroy Thomas and Barry Thomas have authority to hire, fire, discipline, promote, demote, transfer, and give pay raises to the Company's employees.  (*Id.* at ¶ 5; Thomas Depo. pp. 9-10).  At all times relevant to this suit, Jackson was a sheet metal worker employed in the new construction part of Defendant's business for which he was paid $11.00 per hour. (Jackson Depo. at pg. 27, lines 18-23 & pg. 80, lines 12-23).

The alleged harassment in question occurred during the latter part of 2003 and approximately the first seven months of 2004 when Jackson was working on two different jobs for Defendant, the Walnut Church of Christ job in Texarkana, Texas, and the Northeast Texas Community College job in Mt. Pleasant, Texas. (Jackson Depo. at pgs. 60-61, 63, 83, 87).  Jackson's alleged harasser was Dwight Harrison ("Harrison")(Jackson Depo. at pg. 54).  At all times relevant to this case, Harrison was a Sheet Metal Job Superintendent for the Company.   (Thomas Affidavit at ¶ 6).

As a Sheet Metal Job Superintendent, Harrison was responsible for the sheet metal work and for directing the work of the Company sheet metal workers working on a job for which he was the

Sheet Metal Job Superintendent. (*Id.*). None of the Company sheet metal workers are permanently assigned to any particular job of the Company but rather are moved around from job to job as work dictates.  (*Id.*).  As such, Harrison directed the work of a Company sheet metal worker only when and to the extent the worker was working on a job for which Harrison was the Sheet Metal Job Superintendent. (*Id.*). Harrison's pay rate was $360.00 per week. (Thomas Depo. at pg. 47, lines 8-13).

Harrison was the Sheet Metal Job Superintendent on both the Walnut Church of Christ job in Texarkana, Texas, and the Northeast Texas Community College job in Mt. Pleasant, Texas. (Jackson Depo. at pgs. 61-62 & pg. 83, lines 22-23).  In his work dealings with Jackson, Harrison referred to himself as a superintendent, not a supervisor. (Jackson Depo. at pg. 54, lines 15-23). During the time Jackson worked on the Walnut Church of Christ job, he worked primarily with two other Company sheet metal workers, Ron Hayes and George Abbott. (Thomas Depo. at pg. 90). During the time Jackson worked on the Northeast Texas Community College job in Mt. Pleasant, he worked only with Ron Hayes and George Abbott. (Thomas Depo. at pg. 99). Ron Hayes and George Abbott are both African- Americans. (Thomas Affidavit at ¶ 7).

Jackson worked on the Walnut Church of Christ job from late 2003 to May or June of 2004. (Jackson Depo. at pg. 60, lines 13 - pg. 61, line 4). Jackson worked on the Northeast Texas Community College job in Mt. Pleasant from June 8, 2004, to July 8, 2004. (Jackson Depo. at pg. 83, lines 11-15 & pgs. 115-116).  Jackson took vacation for one week, came back to work on July 19, at which time Jackson was informed he had been moved to the Arkansas Tourist Information facility, outside of Texarkana.  (*Id.* at pg. 115, line 21 - pg. 116, line 25).

Laroy and Barry Thomas first learned of the alleged racial harassment in question on the basis

of a conversation each had with Ron Hayes, a co-worker of Jackson. (Thomas Affidavit at ¶ 8). Hayes talked with Barry Thomas on Thursday, July 1, 2004, and with Laroy Thomas the following day, Friday, July 2, 2004.  (*Id.*).  Laroy Thomas states Hayes informed him that he had been called names on the job by Harrison and that Harrison had likewise made offensive sexual remarks to him. (*Id.*).  Hayes further informed Laroy Thomas that Jackson had been treated the same way by Harrison. (*Id.*).  After Laroy Thomas talked with Hayes on July 2, 2004, he met with Barry Thomas that same day, and it was decided that Laroy Thomas should go to the job site in Mt. Pleasant where Hayes and Jackson were then working and investigate the matter. (*Id.*; Thomas Depo. at pgs. 25-26 & pg. 55).

Monday, July 5, 2004, was a holiday, and none of the Company's employees were present at the Mt. Pleasant job site that day.  (Thomas Affidavit at ¶ 9).  Harrison was off work on the following Tuesday and Wednesday because of a family illness and was not present at the Mt. Pleasant job site on those two days. (*Id.*).  As a consequence, Laroy Thomas did not go to the Mt. Pleasant job site until Thursday, July 8, 2004.[2]  (*Id.*).

Since the inception of the Mt. Pleasant job: there had only been three Company sheet metal workers on this job, Jackson, Hayes, and George Abbott. (Thomas Affidavit at ¶10).  Harrison had been the Sheet Metal Job Superintendent on this job since its inception. (*Id.*).  All four of these men were present at this job site on July 8, 2004, and Laroy Thomas interviewed all four men. (*Id.*).

---

[2] According to Defendant, in his deposition, Laroy Thomas testified he went to the Mt. Pleasant job site on Tuesday, July 6, 2004. Defendant states, after giving this deposition, Laroy Thomas reviewed the Company time sheets and remembered that Harrison was off work on Tuesday, July 6, 2004, and Wednesday, July 7, 2004, and that it was not until Thursday, July 8, 2004 that he went to the Mt. Pleasant job site.

Laroy Thomas first conducted a joint interview of Jackson and Hayes. (Thomas Affidavit at ¶ 11).  Hayes did most of the talking for the two men. (*Id.*).  Hayes, with Jackson nodding in agreement, stated that Harrison had called him "nappy headed."  (*Id.*).  Hayes also stated Harrison had told him to "suck his dick." (*Id.*).  Thomas asked each of the men individually if Harrison had ever called them the "N" word.  (*Id.*).  Hayes and Jackson both responded in the negative to the question. Neither Hayes nor Jackson said anything further to Thomas to indicate their problem with Harrison was racially related. (*Id*; Thomas Depo. at pgs. 56-57).

Laroy Thomas did not construe Hayes' statement about being called nappy headed as a racial slur. (Thomas Affidavit at ¶ 12).  Thomas had heard this expression used in referring to white persons who came to work without combing their hair. (*Id.*; Thomas Depo. at pg. 19, lines 11-15 & pg. 20, lines 3-6).  Laroy Thomas next interviewed George Abbott separately. (Thomas Affidavit at ¶ 13).  Abbott told Thomas that Harrison did not talk to Jackson and Hayes any differently than any other people and that he did not think Harrison had ever called Jackson or Hayes anything considered a racial slur. (*Id.*; Thomas Depo. at pg. 57, lines 4-11).  Thomas testified at the time, he was thinking about the "N" word, and he did not think to ask Abbott about sexual remarks.  (Thomas Depo. at pg. 57, lines 11-14).

Laroy Thomas then interviewed Harrison separately. (Thomas Affidavit at ¶ 14).  After Thomas told Harrison what Jackson and Hayes had said, Harrison admitted he might have used the expression "nappy headed" once in talking with Jackson and Hayes but denied he had used any racial slurs in talking with them. (*Id.*).  Additionally, Harrison denied he had told Hayes to "suck his dick." (*Id.*). Thomas informed Harrison he was going to have to clean up his language and if he learned Harrison ever used a racial slur in talking with a Company employee of a different race, Harrison

would be fired. (*Id.*; Thomas Depo. at pg. 120, lines 18-25).

After talking with Harrison, Laroy Thomas again talked with Jackson and Hayes. (Thomas Affidavit at ¶ 15). Thomas told Jackson and Hayes he would deal with the problem they were having with Harrison and they should report any offensive remarks Harrison might make to them in the future directly to him. (*Id.*). On Friday, July 9, 2004, Jackson met with Barry Thomas and talked to him about the problems he was having with Harrison. (Thomas Affidavit at ¶ 16).

Also on Friday, July 9, 2004, Laroy Thomas conferred with Barry Thomas regarding the conversations he had had with Jackson, Hayes, Abbott, and Harrison the day before in Mt. Pleasant. (Thomas Affidavit at ¶ 17). This conversation occurred after Barry Thomas had talked with Jackson earlier that same day, and Barry Thomas informed Laroy Thomas of his talk with Jackson. (*Id.*). On the basis of his conversations with Jackson, Hayes, Abbott, and Harrison in Mt. Pleasant, Laroy Thomas was not convinced Harrison had done anything for which he should be disciplined. (Thomas Affidavit at ¶ 18). He was, however, convinced there was a problem on the Mt. Pleasant job and something had to be done if the job was to progress. (*Id.*). He and Barry Thomas decided to separate Jackson and Hayes from Harrison by transferring Jackson and Hayes to other jobs which the Company was then in a position to do. (*Id.*).

Jackson was off work on vacation the week of July 12, 2004. (Thomas Affidavit at ¶ 19). Effective Monday, July 19, 2004, Jackson was transferred to a Company job in Texarkana, Arkansas. (*Id.*). Jackson resided in Texarkana, Arkansas, at the time, and this job transfer enabled him to work on a job much closer to his home with far less work commuting time than the Mt. Pleasant job. (*Id.*). Jackson performed the same work and for the same pay on the Texarkana, Arkansas, job as on the Mt. Pleasant job. (*Id.*). On the Texarkana, Arkansas, job, Jackson did not have to work with

10

Harrison as the Sheet Metal Job Superintendent which Jackson testified was a good thing. (*Id.*; Jackson Depo. at pg. 123, line 24 - pg. 124, line 4).  During the time Jackson remained in the Company's employ, he never again worked on a job where Harrison was the day-to-day supervisor. (Jackson Depo. at pg. 129, line 14 - pg. 130, line 11).

## VI. PLAINTIFF'S EVIDENCE

Plaintiff relies on the following evidence: (1) Deposition excerpts from Raymond Jackson's deposition ("Exh. A"); (2) Affidavit of Raymond Jackson ("Exh. "B"); (3) Affidavit of Ryan Lovewell ("Exh. C"); (4) Deposition excerpts from Ron Hayes' deposition ("Exh. D"); (5) Deposition excerpts from Tim Hudson's deposition ("Exh. E"); (6) Deposition excerpts from Gregory Bellew's deposition ("Exh. F"); (7) Deposition excerpts from Dwight Harrison's deposition (taken by the EEOC)("Exh. G"); (8) Deposition excerpts from Dwight Harrison's deposition (taken by Ron Hayes' attorney)("Exh. H"); (9) Deposition excerpts from Laroy Thomas' deposition (taken by Ron Hayes' attorney)("Exh. I"); (10) Deposition excerpts from Laroy Thomas' deposition (taken by the EEOC)("Exh. J"); (11) EEOC Charge filed by Raymond Jackson ("Exh. K"); and (12) EEOC Charge filed by Ron Hayes ("Exh. L").  Plaintiff's summary judgment evidence establishes the following:

It is undisputed that beginning in November/December 2003, Jackson was assigned to work on the Walnut Church of Christ ("Walnut Church") project. Also assigned to work on this project were Sheet Metal Installers Ryan Lovewell, George Abbot, Ron Hayes, and Superintendent Dwight Harrison. In June of 2004, Abbot, Hayes, and Jackson were transferred to work on the Northeast Texas Community College project in Mt. Pleasant, Texas.  Jackson worked on the Mt. Pleasant job

from approximately June 8, 2004 until his transfer to another job site on July 19, 2004. (Exh. A at pg. 115, lines 21-25 & pg. 116, lines 1-7; Exh. B at pg. 2).

When Jackson worked on the Walnut Church project, he worked with Sheet Metal Installer Ryan Lovewell, who was assigned to this project from approximately January 2004 to March 2004. (Exh. C at pg. 1)(Exh. A at pg. 61, lines 11-25 & pg. 62, line 1)(Exh. H at pg. 14, lines 6-25). Lovewell is white.  (Exh. A at pg. 62, lines 2-5).  George Abbott's race is unknown, although Jackson testified Harrison referred to George Abbot as an "Indian" or "Injun." (Exhibit "A," Deposition of Raymond Jackson at pp. 85, lines 10-25 & pg. 86, lines 1-5).  Hayes, a black man, has asserted a separate Title VII cause of action in this Court for racial discrimination against the Company. (*See* Cause No. 5:05cv195).

According to Jackson, Harrison called him "nappy-headed" and an  "old, black, nappy-headed S.O.B." (Exh. A at pg. 62, lines 20-25).  Lovewell testified in his affidavit that, while working on the Walnut Church project, he heard Harrison call Jackson "nappy-headed" about 15 or 16 times and that Harrison never called a white person "nappy-headed."  (Ex. C at pg. 1).  Lovewell further testified that, while working on the Mt. Pleasant project, Harrison called Jackson "nappy-headed" about 15 times and that Harrison never called a white person "nappy-headed."  (*Id.* at pg. 2).  According to Lovewell, Harrison also called Jackson a racially derogatory phrase from the mini-series "Roots," being "my little Toby," almost every day. (*Id.*).  Lovewell also heard Harrison call employee Horace Trammel a "Black son-of-a-bitch" about 12 times and employees Jorge Moya and Clay Moya a "wetback" several times.  (*Id.*).

Both Jackson and Hayes complained to multiple Company managers regarding the harassment. While Jackson was still working on the Walnut Church project (between January and

12

May 2004), he complained about Harrison's behavior at least five times to the head Sheet Metal Superintendent, Tim Hudson. (Exh. A at pg. 71, line 1 - pg. 72, line 9 & pg. 73, lines 12-17)(Exh. E at pg. 13, lines 11-19). Hudson told Jackson that he had spoken to Laroy Thomas about his complaint and that there was nothing he could do about the situation. (Exh. A at pg. 74, lines 15-25; pg. 75: 1-14). Jackson also complained about Harrison's racial slurs to Supervisor Michael York. (*Id.* at pg. 74, lines 4-10)(Exh. I at pg. 10: 14-17). According to Jackson, Supervisor Tony Richburg witnessed Harrison's harassment of Jackson at the Walnut Church project. (Exh. A at pg. 100, line 20- pg. 101, line 20). While working at Mt. Pleasant, Jackson also reported Harrison's racial harassment to Plumbing Supervisor Horace Trammel (*Id.* at pg. 72, lines 4-13).  Although Jackson finally met with Vice-President Barry Thomas regarding Harrison's racial harassment after his multiple complaints to others went unaddressed, the date of the meeting is unknown. (*Id.* at pg. 103, line 22- pg. 104, line 2).

Hayes first reported the racial harassment to Vice-President Barry Thomas when he was working at the Walnut Church project in the Spring of 2004. (Exh. D at pg. 49, line 18- pg. 50, line 19). After this complaint, no action was taken to end the harassment, and Harrison continued the conduct, including telling Hayes that "the only thing that black folks wanted was a raise and a watermelon." (*Id.* at pg. 46, lines 6-18). Hayes complained to Hudson about Harrison calling him a "nigger" and other racial slurs, including a statement about "all niggers are good for is kinky hair and eating watermelon." (*Id.* at pg. 87, line 20- pg. 88, line 9)(Exh. E at pg. 10, line 16 - pg. 11, line 18). Hudson told Vice-President Barry Thomas about the situation, but Hudson has no knowledge if Thomas took any action at that time in response to the complaint. (Exh. E at pg. 12, lines 4-25). Hayes also reported Harrison's racial harassment to Foreman Gregory Bellew. Hayes told Bellew

that Harrison called him racial slurs, including the "nigger" slur and the statement "all niggers want is a check and a watermelon." (Exh. F at pg. 18, line17- pg. 19, line19).

When Hayes reported the racial harassment to Laroy Thomas during the Mt. Pleasant job, he told Thomas that Harrison had called him racial slurs, including, "nappy-head," and "Black nappy-head." (Exh. D at pg. 85, lines 14-24). When Jackson complained of Harrison's racial harassment to Vice-President Barry Thomas during the Mt. Pleasant job, Thomas never investigated Jackson's complaint, never followed-up with Jackson about the complaint, never interviewed anyone in conjunction with Jackson's complaint, and Laroy Thomas never interviewed Jackson as part of any investigation of the complaints of racial harassment that had been made against Harrison. (Exh. A at pg. 103, line 6 - pg. 125, line 9)(Exh. J at pg. 72, line 23- pg. 73, line 4 & pg. 106, lines 3-7). When Laroy Thomas visited the Mt. Pleasant job site in July of 2004, Jackson was not present because he was on vacation. (Exh. A at pg. 113, lines 1-14).

Laroy Thomas, during his deposition, stated that he had already reviewed time sheets to determine when he visited the Mt. Pleasant job site. He testified under oath, and having already reviewed time sheets, that he visited the site on July 6.  (Exh. J at pg. 59, lines 8-25 & pg. 60, lines 1-11).  For the first time in Defendant's summary judgment motion, the visit apparently took place on July 8. (Defendant's Motion for Summary Judgment at p. 4, n. 1).  Regardless, whenever Laroy Thomas visited the Mt. Pleasant job site in July of 2004, Jackson was not present because he was on vacation the whole week, and he was never interviewed at the job site or anywhere else by Laroy Thomas in conjunction with his complaint that Harrison had subjected him to racial harassment. (Exh. A at pg. 113, lines 1-14)(Exh. D at pg. 77, line 14- pg. 78, line13 & pg. 79, line 25 - pg. 80, line 11).   Before Laroy Thomas spoke with Barry Thomas on or about July 9, the decision had

14

already been made to transfer Jackson to a different job site. (Exh. J at pg. 70, lines 4-12).

Hayes testified George Abbot was never interviewed by Laroy Thomas regarding the complaints of racial harassment made against Harrison. Abbott would not speak with Thomas; he simply told him "I don't know nothing" and walked off. (Exh. D at pg. 82: line 24 - pg. 83, line 5). According to Harrison, the only statements that Thomas said to Harrison included a question of what was going on, if Harrison said something or did something, he would be fired, and indicated that he would talk to "them." Nothing else was said by Thomas to Harrison during this conversation. (Exh. G at pg. 93, line 18- pg. 95, line 14). The only statements that Harrison made during this "interview" was that he "didn't say anything," yet Laroy Thomas testified he believed Harrison acknowledged he had called Jackson and Hayes "nappy headed." (*Id*. at p. 95, lines 6-14)(Exh. J at pg. 58, lines 4-7). When Laroy Thomas spoke with Hayes, Hayes told him that Harrison had called him racial slurs, including "nappy-head" and "Black nappy-head."(Exh. D at pg. 85, line 4- pg. 88, line 4).  Hayes testified he does not recall if Laroy Thomas specifically asked him about the "n" word, but that he probably told him Harrison had called him the racial slur.  (*Id.* at pg. 197, lines 1-3).

In his January 18, 2006 deposition, Laroy Thomas testified the only thing that might be construed as a racial slur in the phrase "black, nappy-headed son of a bitch" is the term "nappy-headed." (Exh. J at pg. 19, lines 1-7). Laroy Thomas testified he has heard of a both black and white people being called "nappy-headed" when their hair is a mess,  but he could not specifically recall anyone who has called a white person the same term. (*Id*. at pg. 19, line 11 - pg. 20, line 15).  Even though he testified in his March 2, 2006 deposition that he had never thought the term "nappy-headed" was racial, Laroy Thomas acknowledged a fear that, based on the complaints of Hayes and Jackson, that there might be a racial component to their complaints. (Exh. I at pg. 32, lines 10-23).

15

Harrison was never disciplined, warned, suspended, given a reduction in pay, or transferred to another job site, and nothing was ever placed in his personnel file reflecting that racial complaints had been made against him and that any further incidents could warrant disciplinary action, including termination. (Exh. J at pg. 106, lines 8-15; pg. 113, lines 21-25; pg. 114, lines 1-21 & pg. 156, lines 18-19).   Instead, Jackson and Hayes were involuntarily transferred to different job sites. (Exh. B)(Exh. D at pg. 126, lines 13-17; pg. 127, line 20- pg.128, line 3).

Jackson never had a problem with the commute to the Mt. Pleasant project. (Exh. A at pg. 82, lines 5-15).  Although he was involuntarily transferred to a different project after Laroy Thomas learned of Jackson's complaints against Harrison, Jackson was reassigned to the Mt. Pleasant project in late December 2004/early January 2005. Although Hudson was the direct supervisor, Harrison oversaw this project, would visit it on a daily basis, and have contact with Jackson whenever he visited.  During these visits, Harrison would call Jackson racial slurs, including "black nappy-headed son-of-a-bitch," "nappy-headed," and he told Jackson that "all you Black folks want is a watermelons and a raise." (Exh. A1 at pgs. 62-65)(Exh. B at pgs. 2-3)(Exh. C).  From May 2005, when the Mt. Pleasant project was completed, until March 2006, Jackson was assigned to work at several projects including, Ross, Urology, and SRT. Harrison , who oversaw all of these projects, would make daily visits and have daily contact with Jackson. (Exh. B at pg. 3).[3]

Subsequent to Jackson and Hayes reporting Harrison's racial harassment to Laroy and Barry Thomas, Laroy Thomas elevated Harrison to the job of Sheet Metal Superintendent (previously occupied by Tim Hudson and explained by Harrison in his deposition as the fourth highest

---

[3] The Court is not relying on this evidence but finds stating the evidence helpful in providing a complete description of the events.

16

management level at the Company after the President, Vice-President, and General Superintendent) in charge of overseeing multiple projects and supervising the Sheet Metal Job Superintendents responsible for these projects. (Exh. G at pg. 131, line 21- pg. 132, line 10; pg. 133, lines 1-23; pg. 135, lines 8-16)(Exh. J at pg. 43, line 15- pg. 44, line 25; pg. 45: 1-12).

When Harrison supervised Hayes on the Walnut Church project, he discussed work performance issues with Hayes.  (Exh. G at pg. 118, lines 16-25 & pg. 119, lines 1-11). Harrison was also involved in hiring George Abbot for a Sheet Metal Installer job and for recommending a pay raise for him. (*Id*. at pg.124, lines 17-24 & pg. 138, lines 8-16).  The Company relies heavily on superintendents and/or supervisors for job assignments. (*Id*. at pg. 62, lines 13-16)(Exh. J at pg. 88, lines 21-25 & pg. 89, line 1). Laroy Thomas also admits that Harrison, as a Superintendent, was substantially involved in employment decisions affecting the individuals he supervised, including decisions relating to pay increases and demotions. (Exh. I at pg. 62, lines 21-25).

Laroy Thomas testified the supervisors play an integral role in determining what employment decisions are made affecting their supervised employees. (*Id*. at pg. 63, lines 1-5). All Superintendents have the authority to temporarily transfer employees when they are shorthanded. (Exh. J at pg. 41, lines 18-25 & pg. 42, lines 1-4).  The first time Hayes was fired, Sheet Metal Superintendent Hudson made the decision. Hudson also made the decision to re-hire Hayes.  (Exh. I at p. 21, lines 8-14; 24-25 & pg. 22, lines 1-9).  Laroy Thomas went along with the decision.  (*Id.* at pgs. 10-11 & 19-20).

According to Lovewell, Harrison had the authority to evaluate his work performance and to discipline him. (Exh. C at pg. 1).  Similarly, because of Harrison, Hayes received a pay increase. (Exh. I at pg. 62, lines 21-25).  Shortly after Harrison was hired, Laroy Thomas held a meeting,

where he informed all the Sheet Metal Installers, including Jackson, that Harrison was the new supervisor in charge of all the sheet metal workers and that he had the authority to fire employees. (Exh. B at pg. 1).  According to Jackson, both Harrison and Hudson had the authority to demote employees. (Exh. A at pg. 121, lines 9-16).

Jackson referred to Harrison as his supervisor at the Walnut Church project and at the Mt. Pleasant project. (Exh. A at pg. 52, lines 16-23; pg. 60, lines 10-19; pg. 62, lines 6-9)(Exh. B). Ron Hayes referred to Harrison as his supervisor. (Exh. D at pg. 40, lines19-23). Ryan Lovewell referred to Harrison as his supervisor. (Exh. C at pg. 1). Laroy Thomas classified Harrison as a supervisor. (Exh. I at pg. 10, lines 14-17; pg. 62, lines 13-25). Harrison has referred to himself as a "supervisor" and as a "direct supervisor" at the Walnut Church project, which Jackson and Hayes were assigned to during 2004. (Exh. G at pg. 124, lines 17-25)(Exh. H at pg. 13, lines10-13 & pg. 15, lines 12-15).

When Harrison performed the Sheet Metal Job Superintendent position at the Walnut Church project (late 2003 to April/May 2004) and at the Mt. Pleasant project between June and July 2004 (before Jackson and Hayes were transferred from the project after their racial harassment complaints), Harrison's job supervisory responsibilities included the following: instructing his subordinates on the work to be done on a daily basis; analyzing the project blueprints and directing his subordinates to comply with the plans with respect to the type of work to be done and when each part was to be completed; ensuring his subordinates' compliance with attendance standards and approving time sheets submitted by these subordinates; coordinating work with the general contractor on the job; evaluating the work that was completed by his subordinates; ensuring that his subordinates had the materials and tools required to do the job; consulting with Laroy Thomas regarding hiring, firing, demoting, and giving pay raises to employees; evaluating his subordinates'

18

work performance and counseling/disciplining them if necessary; and transferring employees and assigning employees to work on a particular project. (Exh. G at pgs. 118, lines 16-25; 119, lines 1-11; 124, lines 17-24; 138, lines 2-16)(Exh. H at pgs. 15, lines 12-15; 26, lines 23-25; 27, lines 1-13)(Exh. I at pgs. 10, lines 6-10; 11, lines 13-23; 62, lines 7-25; 63, lines1-5)(Exh. J at pgs. 41, lines 18-25; 42, lines 1-4; 77, lines 10-22; 85, lines 1-9; 88, lines 21-25; 89, line 1; 94, lines 21-25; 95, lines 1-5; 138, lines 9-16)(Exh. B at pgs. 1-2)(Exh. C at pgs. 1-2).

## VII.  DISCUSSION

### A.    Applicable Law

### 1.    Vicarious liability versus negligence standard

First, the Court must determine whether a vicarious liability or negligence standard applies to Plaintiff's allegations against Defendant.  This involves determining whether Harrison was Jackson's "supervisor with immediate (or successively higher) authority over the employee" or a co-worker of the employee.  *Ellerth*, 524 U.S. at 765; *Faragher*, 524 U.S. at 807.  "If the alleged harassing employee is a supervisor, and he or she took a 'tangible employment action' against the plaintiff, the employer is strictly liable.  If the supervisor did not take a tangible employment action against the plaintiff, the employer may raise an affirmative defense that it 'exercised reasonable care to prevent and correct promptly any . . . harassing behavior, and . . . that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.' *Mack v. Otis Elevator: Creating More Supervisors and More Vicarious Liability for Workplace Harassment*, 79 St. John's L. Rev. 521, 529-30 (2005), *quoting Ellerth*, 524 U.S. at 765 & *Faragher*, 524 U.S. at 807-08.

If the alleged harasser is not a supervisor, but a co-worker, "liability exists only if the

employer was negligent."  *Mack v. Otis Elevator: Creating More Supervisors and More Vicarious Liability for Workplace Harassment*, 79 St. John's L. Rev. at 530.  An employer is negligent with respect to harassment if it knew or should have known about the conduct but failed to stop it. *Anderson v. Ultraviolet Systems, Inc.*, 2005 WL 1840155, *6 (S.D. Tex. 2005)(unreported).  To state a hostile work environment claim under Title VII regarding harassment by a co-worker, a plaintiff must prove (1) that he belongs to a protected class, (2) that he was subject to unwelcome harassment, (3) that the harassment was based on race, (4) that the harassment affected a term, condition, or privilege of employment, and (5) that the employer knew or should have known about the harassment and failed to take prompt remedial action.  *Id.* at *6.  "In cases in which an employee asserts a harassment claim against a supervisor, the employee need only satisfy the first four elements of the traditional Title VII test, at which point the employer may seek to prove an affirmative defense; however, the standard five-part test continues to apply to harassment from co-workers."  *Id.* at *7.

## 2.      Broad definition versus narrow definition of "supervisor"

As noted above, the Supreme Court in *Ellerth* and *Faragher* did not answer the question, "who is a supervisor?" other than to state that an employer is vicariously liable "for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the [victimized] employee." *Ellerth*, 524 U.S. at 765.  In *Ellerth*, the plaintiff alleged she was subjected to sexual harassment by her supervisor, Slowik, claiming he made "offensive remarks and gestures as well as unfulfilled threats to affect the terms and conditions of employment." *Mack v. Otis Elevator: Creating More Supervisors and More Vicarious Liability for Workplace Harassment*, 79 St. John's L. Rev. at 530.  Slowik was a mid-level manager with "authority to make hiring and

20

promotion decisions subject to the approval of his supervisor." He was not the plaintiff's immediate supervisor. *Id.* at 530-31, quoting *Ellerth*, 524 U.S. at 747. Although it did not define "supervisor," the Supreme Court noted a supervisor is "empowered by the company as a dinstinct class of agent to make economic decisions." *Ellerth*, 524 U.S. at 762 (stating that "[t]angible employment actions fall within the special province of the supervisor" and "are the means by which the supervisor brings the official power of the enterprise to bear on subordinates").

In *Faragher*, decided the same day as *Ellerth*, the Supreme Court again considered "when an employer may be held liable under Title VII for a hostile work environment created by supervisory employees. The Court applied the same rationale as it did in *Ellerth*, evaluating agency principles, as well as Title VII policies, to conclude that the city of Boca Raton was vicariously liable to the plaintiff for the actionable hostile work environment created by supervisory employees." *Mack v. Otis Elevator: Creating More Supervisors and More Vicarious Liability for Workplace Harassment*, 79 St. John's L. Rev. at 532-33 (internal citations omitted). In *Faragher*, the alleged supervisors, Terry and Silverman, allegedly subjected the plaintiff to "uninvited and offensive touching," lewd remarks, and offensive comments regarding women. *Faragher*, 524 U.S. at 780, *quoting* Plaintiff's Complaint, *Faragher v. City of Boca Raton*, 864 F. Supp. 1552 (S.D. Fla. 1994) (No. 92-8010). Terry had the "authority to hire new lifeguards (subject to the approval of higher management), to supervise all aspects of the lifeguards' work assignments, to engage in counseling, to deliver oral reprimands, and to make a record of any such discipline." *Id.* at 781. Silverman, had the responsibility for "making the lifeguards' daily assignments, and for supervising their work and fitness training." *Id.* "The Court considered both men supervisors, because it was undisputed they had "virtually unchecked authority" over the plaintiff, "directly controll[ed] and supervis[ed] all

21

aspects of [Faragher's] day-to day activities," and because the plaintiff and her colleagues were "completely isolated from the City's higher management."  *Id.* at 808, *quoting Faragher v. City of Boca Raton*, 111 F.3d 1530, 1544 (11th Cir. 1997)(Barkett, J., dissenting in part and concurring in part), rev'd, 524 U.S. 775 (1998)).

As discussed in more detail below, *Faragher* raises the issue of "whether supervisory authority must include the ability to take a tangible employment action, or whether directing daily activities is sufficient to impose supervisory status.  Since only one of the supervisors clearly had authority to take tangible employment actions, the EEOC and some courts have concluded that in order for an individual to be considered a supervisor, he or she need only possess the authority to direct work activities."  *Mack v. Otis Elevator: Creating More Supervisors and More Vicarious Liability for Workplace Harassment*, 79 St. John's L. Rev. at 533.  The author of the Saint John's Law Review article, *Mack v. Otis Elevator: Creating More Supervisors and More Vicarious Liability for Workplace Harassment*, relying in part on *Browne v. Signal Mountain Nursery*, L.P., 286 F. Supp. 2d 904, 917 (E.D. Tenn. 2003)("one can infer from the unique circumstances in *Faragher* that the individual defendants had effective control over more than just daily work activities."), states the Supreme Court did not intend to define the term "supervisor" as one who has the authority to direct work activities, "but rather as one who can take or recommend tangible employment actions."  *Mack v. Otis Elevator: Creating More Supervisors and More Vicarious Liability for Workplace Harassment*, 79 St. John's L. Rev. at 534.

After *Ellerth* and *Faragher*, the Equal Employment Opportunity Commission revised its enforcement guidelines regarding employer liability for supervisory harassment under Title VII. *Id.* at 535.  Adopting a broad definition of "supervisor," the EEOC guidelines provide an individual may

qualify as a "supervisor" not only when he has the power to take or recommend tangible employment actions, but also when he has the authority to "direct the employee's daily work activities." *Id.* at 535. The EEOC "then qualifies this ability to direct work activities by stating that if the person simply 'relays other officials' instructions regarding work assignments" or "directs only a limited number of tasks or assignments," the person would not qualify as a supervisor. *Id.* at 536, *quoting* EEOC, Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors, http:// www.eeoc.gov/policy/docs/harassment.html (last modified June 21, 1999).

The decisions of the courts having addressed this issue are not consistent, and the Fifth Circuit has not weighed in on the issue. The majority of the courts hold that, to be a supervisor, the alleged harasser must have had the power (not necessarily exercised) to take tangible employment action against the victim, such as the authority to hire, fire, promote, or reassign to significantly different duties. In *Hall v. Bodine Elec. Co.*, 276 F.3d 345, 355 (7th Cir.2002) and *Parkins v. Civil Constructors of Ill., Inc.*, 163 F.3d 1027, 1034 (7th Cir.1998), the Seventh Circuit held an employee must have the authority to directly affect the terms and conditions of the plaintiff's employment in order to qualify as a supervisor and render the employer vicariously liable for the employee's harassing conduct. According to the Seventh Circuit, the authority to oversee the plaintiff's work is not deemed sufficient to meet that test. The First, Fourth, and Eighth Circuits have also adopted this narrow definition. *See Mikels v. City of Durham*, 183 F.3d 323, 333-34 (4th Cir.1999); *Joens v. John Morrell & Co.*, 354 F.3d 938, 940 (8th Cir.2004); *Noviello v. City of Boston*, 398 F.3d 76, 95 (1st Cir. 2005).

Other courts have criticized the supervisory standard articulated by the Seventh Circuit as too narrow. *See Mack v. Otis Elevator Co.*, 326 F.3d 116, 126-27 (2d Cir.), *cert. denied*, 540 U.S.

1016 (2003); *See also Kent v. Henderson*, 77 F. Supp. 2d 628, 634 (E.D. Pa. 1999)(considering whether the employee had the authority to "affect [the plaintiff's] daily work activities" in determining whether the employee could be considered the plaintiff's supervisor); *Dinkins v. Charoen Pokphand USA, Inc.*, 133 F.Supp.2d 1254, 1266 (M.D. Ala.2001)(ruling an employee is a supervisor when the employee has "actual authority to take tangible employment actions, or to recommend tangible employment actions if his [or her] recommendations are given substantial weight by the final decisionmaker, or to direct another employee's day-to-day work activities in a manner that may increase the employee's workload or assign additional or undesirable tasks."); *Entrot v. BASF Corp.*, 359 N.J.Super. 162, 819 (2003); *Anderson v. Ultraviolet Sys., Inc.,* 2005 WL 1840155, *7 (S.D. Tex. 2005)(ruling that employee was not plaintiff's "supervisor" because he did not supervise her daily activities or direct her work assignments).  The Second Circuit in *Mack v. Otis Elevator Co.*, 326 F.3d 116 (2d Cir. 2003) ruled that the definition of "supervisor" is more akin to employees who have the authority to affect the plaintiff's day-to-day work activities. *Id.* at 126-27.

The Court notes the more narrow standard has been questioned within the circuits that have adopted such an approach.  For example, in a concurring opinion in *Rhodes v. Illinois Dept. of Transp.*, 359 F.3d 498, 509 (7th Cir. 2003), Judge Rovner stated the Seventh Circuit's "[i]nsistence that the harasser have the power to take such formal employment actions as hiring, firing, or demotion before he will be treated as a supervisor strikes me as a particularly narrow view. . . ." Judge Rovner continued as follows:

> Cases like this one suggest that we ought to re-examine the criteria we have articulated for identifying supervisors. The standard that this circuit has established has the allure of drawing a bright line between those who have the power to make formal employment decisions and those who do not. But it excludes from the category of supervisor those employees who, although lacking final authority to hire,

24

fire, promote, demote, or transfer the plaintiff, nonetheless enjoy substantial authority over the plaintiff's day-to-day work life. To that extent, it is a standard that arguably does not comport with the realities of the workplace. And to the extent that employers with multiple worksites vest the managers of such sites with substantial authority and discretion to run them but reserve formal employment authority to a few individuals at central headquarters, our standard may have the practical, if unintended, effect of insulating employers from liability for harassment perpetrated by their managers.

*Id.* at 510. Judge Cudahy joined Judge Rovner's special concurrence to the extent that it suggests the reconsideration and broadening of the Seventh Circuit's criteria for identifying supervisors. *Id.* Despite the Seventh Circuit's acknowledgement of the dissatisfaction expressed with its definition of supervisor, the court recently stated the issue of whether or not its definition of supervisor "needs retooling will wait for another day and another case." *Higee v. Sentry Ins. Co.*, 440 F.3d 408, 409 (7th Cir. Mar. 3, 2006).

In sum, currently the Seventh, Fourth, and First Circuits have narrowly defined the term "supervisor" and have concluded that supervisory authority consists primarily of the ability to take tangible employment action. Although the Fifth Circuit has not specifically addressed the issue, prior to *Ellerth* and *Faragher*, the Fifth Circuit defined the essential attributes of a supervisor for purposes of a claim of hostile environment sexual harassment under Title VII. In *Pfau v. Reed*, 125 F.3d 927, 930-37 (5th Cir.1997), *cert. granted and vacated on other grounds*, 525 U.S. 801 (1998), for instance, the plaintiff claimed that her audit team supervisor had sexually harassed her. The Fifth Circuit held the audit team supervisor did not qualify as a supervisor for purposes of Title VII. *Id.* at 937. While it emphasized that the audit team supervisor could not hire or fire other employees, the court also noted that he simply did not exercise any significant control over the terms of plaintiff's employment. *Id.* For example, the audit team supervisor's powers were limited to recommending subordinate awards or discipline and handling the procedural aspects of Pfau's

25

termination. The court held that these powers alone were not substantial enough to hold the employer liable for the audit team supervisor's harassment. *Id.* This decision was remanded to the district court level in order to determine, in part, whether an audit team supervisor qualifies as a supervisor under the *Faragher* and *Ellerth* definition. 167 F.3d 228 (5th Cir.1999). The district court's decision on remand was not published.

In urging the Court to adopt the narrow definition of "supervisor," Defendant relies on, among other things, *Nash v. Electrospace Sys., Inc.*, 9 F.3d 401 (5th Cir. 1993), a Fifth Circuit case decided before *Ellerth* and *Faragher*. The *Nash* Court ruled that the reason the purported supervisor was not considered a "supervisor" for purposes of *respondeat superior* liability was because he "was not responsible for the terms and conditions of her employment, for her work assignments within the company, *or* for hiring or firing decision." *Id.* at 404. (Emphasis added).

From these cases, the Court will not speculate on how the Fifth Circuit would rule on the definition of "supervisor." However, from the Court's own review of other pertinent materials, the Court is of the opinion the Second Circuit's definition of "supervisor" may be too broad. *See, e.g. Mack v. Otis Elevator: Creating More Supervisors and More Vicarious Liability for Workplace Harassment*, 79 St. John's L. Rev. at 541-550. The author of the law review article suggests:

> an employee should qualify as a supervisor for the purposes of finding the employer vicariously liable under Title VII when the employer has granted to the employee the authority to recommend or to take tangible employment actions against his or her subordinates. It is this actual power to make economic decisions affecting other employees that distinguishes a supervisor from a mere coworker and aids the supervisor in creating a hostile work environment. The authority given to a supervisory employee need not be plenary, but it should include more than simply the ability to direct another employee's work activities. Finally, determining which employees qualify as supervisors should not be based on title, but requires a particularized inquiry into the nature and extent of the authority bestowed upon an

employee by an employer.

*Id.* at 550 (internal citations and quotations omitted).

Similarly, the Court has located a case where following an adverse jury verdict, the plaintiff

filed a motion for new trial identifying numerous grounds in support of her motion.  *See Browne v.*

*Signal Mountain Nursery, L.P.*, 286 F.Supp.2d 904, 907 (E.D. Tenn. 2003).   One of plaintiff's

grounds was that the court's instructions to the jury were erroneous in that the court incorrectly

defined the term "supervisor."  *Id.* at 910.  The court's instruction to the jury regarding the definition

of "supervisor" was as follows:

> A 'supervisor' under the law is not a matter of title. Under the law a supervisor is a
> person with immediate or successively higher authority over the employee and who
> exercises significant control over the plaintiff's hiring, firing, or conditions of
> employment. The supervisor has been empowered by the company as a distinct class
> of agent to make economic decisions affecting other employees under his control.
> The essence of supervisory status is the authority to affect terms and conditions of
> employment, primarily consisting of the power to hire, fire, demote, promote or
> transfer, or discipline employees.

*Id.* at 911, n. 3.

After considering both views on the definition of "supervisor," the trial court held the

plaintiff has not demonstrated the court's instruction was in error and denied the plaintiff's motion

for a new trial.  *Id.* at 918.  In so holding, the court stated the test of who qualifies as a supervisor

"does not require a supervisor have final plenary power to take tangible employment actions, but

only the power to recommend, set in motion, or effect such actions. Almost all companies reserve

final decisionmaking power in some person or entity other than the immediate supervisor and there

is no reason to believe companies will ever be able to eschew the evaluative and administrative

27

processes so completely that personnel decisions are formulated and influenced solely by individuals who have never had any contact with the subject employee." *Id.* at 916.  In summary, the court stated as follows:

> an employee does not qualify as a 'supervisor' for purposes of Title VII employer vicarious liability unless he or she is placed by the employer, formally or informally, in a position of superior authority and possesses some significant degree of control over the hiring, firing, demotion, promotion, transfer, or discipline of subordinates. Supervisory status is not a formulaic question of title, but a particularized inquiry into the nature and extent of the authority bestowed upon an employee by an employer. The authority entrusted in a supervisory employee need not be plenary or absolute, but it must encompass, in some significant way, the power to initiate, recommend, or effect tangible employment actions affecting the economic livelihood of the supervisor's subordinates.

*Id.* at 918.

## B.     The Court's definition of "supervisor."

Turning to the merits of Defendant's motion, Defendant urges the Court to define "supervisor" as one with "the authority to hire, fire, promote, reassign to significantly different duties, or otherwise take tangible employment action against Jackson or any other employee of the Company." (Defendant's mot. at pg. 12).  According to Defendant, Harrison did not have such authority; only Laroy and Barry Thomas had such authority in the Company.  On the other hand, Plaintiff urges the Court to adopt a broader definition of "supervisor" than offered by Defendant. However, Plaintiff argues, under any definition adopted by the Court, there is sufficient evidence Harrison was a supervisor to preclude summary judgment.

The Court, having reviewed the relevant case law and arguments of the parties, is of the opinion the most appropriate definition of "supervisor" is the one provided in summary by the court

in *Browne v. Signal Mountain Nursery, L.P.*:

> an employee does not qualify as a 'supervisor' for purposes of Title VII employer vicarious liability unless he or she is placed by the employer, formally or informally, in a position of superior authority and possesses some significant degree of control over the hiring, firing, demotion, promotion, transfer, or discipline of subordinates. Supervisory status is not a formulaic question of title, but a particularized inquiry into the nature and extent of the authority bestowed upon an employee by an employer. The authority entrusted in a supervisory employee need not be plenary or absolute, but it must encompass, in some significant way, the power to initiate, recommend, or effect tangible employment actions affecting the economic livelihood of the supervisor's subordinates.

286 F.Supp.2d at 918. This definition requires more than just daily supervision of daily work activities and work assignments.  However, it acknowledges that the authority entrusted to the supervisory employee need not be absolute; it can encompass the power to initiate, recommend, or effect tangible employment actions.

**C.**   **The Court finds sufficient evidence to create a genuine issue of material fact that Harrison was Plaintiff's "supervisor."**

It is undisputed that Harrison supervised Jackson's daily work activities and directed his work assignments. Defendant acknowledges Harrison did have the authority to direct Jackson's work during the time Jackson worked on a job on which Harrison was the Sheet Metal Job Superintendent.[4] (Defendant's mot. at pg. 12). Laroy Thomas testified Harrison was solely responsible for supervising Jackson and directed him in his daily work activities. Laroy Thomas even observed Harrison instruct Jackson with respect to the method of putting the duct work together and explaining to him where the duct work would be installed. Harrison was solely responsible for giving

_____

[4]  The Court notes the fact that Harrison's title was Job Superintendent and not "supervisor" is irrelevant – "nomenclature is not determinative." *See e.g., Quioz v. Ganna Construction*, 1999 WL 59836, *19 (N.D. Ill. 1999)(unreported).

Jackson his daily work assignments at both the Walnut Church and Mt. Pleasant projects. (Exh. J at pg. 94, line 21- pg. 95, line 5)(Exh. B)(Exh. C).

Laroy Thomas testified the Superintendents (Harrison's job title) are responsible for making the decisions regarding which employees work on which projects. Moreover, Laroy Thomas acknowledged that Harrison was in charge of job assignments for the Sheet Metal Installers (Jackson's job title). As such, Laroy Thomas indicated Superintendents have the authority to temporarily transfer employees. Moreover, Harrison was solely responsible for giving Jackson detailed instructions regarding his daily work assignments at both the Walnut Church and Mt. Pleasant projects.

On a daily basis, Harrison, after reviewing the project blueprints, would instruct Jackson on what part of the project to install duct, the type of work to be completed, the size of the duct to be installed, the method of installation, and when each part of the project was to be completed. (Exh. B at pgs. 1-2). When Sheet Metal Installer Ryan Lovewell worked on the Walnut Church project at the same time as Jackson, Harrison was in charge of giving him daily work assignments involving duct installation on different parts of the project, including the method installation. (Exh. C at pgs. 1-2). Because Jackson was relatively new to sheet metal work, Harrison was responsible for laying out the work that had to be done, coordinating the work on the job, and supervising his work to ensure that it was being properly done. (Exh. H at pg. 27, lines 2-9)(Exh. G at pg. 44, line 20- pg.45, line 2). Laroy Thomas never directly supervised Jackson – Harrison was Jackson's supervisor and directed him what to do on each job. (Exh. J at. pg. 85, lines 1- 9).

Plaintiff has also offered evidence that shows a number of employees and supervisors viewed

Harrison as having supervisory authority.  Within one week after Harrison was hired, Laroy Thomas informed all the Sheet Metal workers, including Jackson, that Harrison was their new supervisor. Jackson, Hayes, and Lovewell referred to Harrison as their "supervisor." Laroy Thomas classified Harrison as a "supervisor," and Harrison referred to himself as a "supervisor" and as a "direct supervisor" at the Walnut Church project, which Jackson, Hayes, and Lovewell were assigned to during 2004.

According to Jackson, Harrison was allowed to drive a Company vehicle to and from his house, and only supervisors were allowed to do this.  (Exh. B at pg. 1).  Non-supervisors, such as Jackson were not allowed to drive the Company vehicles home and were only allowed to drive the Company vehicles between job sites or between the shop and a job site.  (*Id.*).

More importantly, considering the definition of "supervisor" adopted by the Court, Plaintiff has submitted evidence sufficient to create a genuine issue of material of fact regarding Harrison's authority to hire and fire employees. According to Laroy Thomas, Superintendents have the authority to fire employees in certain circumstances like if an employee comes to the job drunk or under the influence of drugs. Specifically, Plaintiff submitted evidence indicating Hudson, who was a Superintendent like Harrison, was responsible for firing Hayes and for re-hiring him. During a meeting shortly after Harrison was hired, President Thomas informed all the Sheet Metal Installers, including Jackson, that Harrison was their new supervisor and had the authority to fire employees. (Exh. B at pg. 1).

Even though Defendant presents evidence indicating Harrison did not have the sole authority to hire or fire employees, Plaintiff presents evidence, when viewed in the light most favorable to

31

him, indicating Harrison recommended employment decisions or consulted in said decisions. Specifically, Laroy Thomas testified he consulted with Harrison regarding hiring, firing, and demoting employees and that Harrison was substantially involved in employment decisions affecting the individuals he supervised. (Exh. I at pg. 11, lines 13-23 & pg. 62, lines 21-25).  In *Durham Life Ins. Co. v. Evans*, 166 F.3d 139 (3d Cir. 1999), a sex discrimination case, the court ruled that the plaintiff's manager was a "supervisor" under Title VII. In so holding, the court noted the fact "[t]hat [the manager] might not have had the authority to act alone did not mean that he was without supervisory authority over [plaintiff]." *Id.* at 155.

Consequently, the Court, having reviewed the evidence in the light most favorable to Plaintiff, finds a genuine issue of material fact regarding whether Harrison was a "supervisor" for purposes of assessing Defendant's liability for subjecting Jackson to a racially hostile work environment.  Based on the evidence, the jury may find, by a preponderance of the evidence, Harrison was Plaintiff's supervisor.

**D.    Assuming the jury finds Harrison was a co-worker and the negligence standard applies, the Court finds sufficient evidence to establish a fact issue that Defendant knew or should have known of the alleged harassment and failed to take prompt remedial action.**

"Generally, the negligence standard governs employer liability for *co-worker* harassment." *See Sharp v. City of Houston*, 164 F.3d 923, 929 (5th Cir. 1999)(emphasis in original). An employer may be liable for harassment if it "knew or should have known of the harassment in question and failed to take prompt remedial action." *Williamson v. City of Houston*, 148 F.3d 462, 464 (5th Cir. 1998).  Notice of the harassing conduct triggers an employer's duty to take prompt corrective action that is "reasonably calculated" to end the harassment.  *Skidmore v. Precision Printing and*

32

*Packaging, Inc.*, 188 F.3d 606, 615 (5th Cir. 1999). "What is appropriate remedial action will necessarily depend on the particular facts of the case - the severity and persistence of the harassment, and the effectiveness of any initial remedial steps. . . . [N]ot every response by an employer will be sufficient to discharge its legal duty. Rather, the employer may be liable despite having taken remedial steps if the plaintiff can establish that the employer's response was not 'reasonably calculated' to halt the harassment." *Id.* at 615-16, *quoting Waltman v. International Paper Co.*, 875 F.2d 468, 479 (5th Cir.1989).

For the following reasons, assuming the jury classifies Harrison a co-worker for purposes of determining the appropriate standard for establishing liability in this case, the Court finds Plaintiff survives summary judgment under this more onerous co-worker harassment standard.  Plaintiff has submitted sufficient evidence to establish a fact issue that Defendant knew or should have known of the alleged harassment and failed to take prompt remedial action.  Specifically, Plaintiff has submitted evidence showing Defendant failed to take prompt remedial action in the following ways, any one of which can result in a finding that Defendant is liable for Harrison's racial harassment.

Under Title VII, an employer has actual knowledge of harassment that is known to "higher management." *Sharp*, 164 F.3d at 929. A person is in "higher management" if he or she has "the power not only to hire and fire the offending employee but also to take disciplinary action, *to provide significant input into employment decisions*, to instruct the offending employee to cease the harassing behavior, or to implement other means of taking remedial action." *Id.* (emphasis added).

As set forth in Section VI, the evidence shows Jackson and Hayes complained about offensive racial comments on multiple occasions to "higher management" employees before their

33

complaints to President Laroy Thomas and Vice-President Barry Thomas in July of 2004 as follows: (a) Hayes complained to Sheet Metal Superintendent Tim Hudson while still working at the Walnut Church project about Harrison's racial slurs, including the word "nigger;" (b) Jackson complained to Hudson at least five times while at the Walnut Church project regarding Harrison's use of racial slurs; (c) Jackson complained to Supervisor Michael York about Harrison's racially pejorative comments; (d) Jackson complained to Plumbing Supervisor Horace Trammel regarding Harrison's racial slurs; and (e) Hayes complained to Manager Gregory Bellew about being subjected to Harrison's racial epithets. Significantly, Barry Thomas first learned of Harrison's racially harassing behavior when Hayes complained to him about Harrison while he was still assigned to the Walnut Church project. The Vice-President never took any action to address the complaint.  Similarly, Laroy Thomas never took any action to stop Harrison's behavior after these early complaints were made against Harrison.

There is also evidence that Defendant failed to conduct a proper and effective investigation of Jackson's racial harassment complaint and, as such, did not take prompt remedial action in response to Jackson's complaints. *See e.g., Malik v. Carrier Corp.*, 202 F.3d 97, 105 (2d Cir. 2000) (noting "an employer's investigation of a harassment complaint is not a gratuitous or optional undertaking; under federal law, an employer's failure to investigate may allow a jury to impose liability on the employer[.]")  When Laroy Thomas visited the Mt. Pleasant job site in July of 2004 to conduct, for the first time despite earlier complaints about Harrison, his investigation, Plaintiff asserts Jackson was not present because he was on vacation. There is evidence indicating Jackson was never interviewed at the job site or anywhere else by Laroy Thomas or Barry Thomas in conjunction with his complaints that Harrison had subjected him to racial harassment. In its reply

34

brief, Defendant states although Jackson initially testified he was not present when Laroy Thomas conducted his interview on July 8, Jackson later testified he was on vacation around July 13 and that he would have worked the week of July 5.  (Jackson Depo. at pgs. 115-116).

There is also evidence from Hayes indicating Laroy Thomas never interviewed co-worker George Abbot regarding the complaints of racial harassment made against Harrison.  Similarly, Plaintiff has presented evidence that Laroy Thomas never properly interviewed Harrison regarding complaints that he had racially harassed Jackson. The only statements that Thomas said to Harrison included a question of what was going on and a statement that if Harrison said something or did something,  he would be fired. Thomas also indicated that he would talk to "them." Nothing else was said by Thomas to Harrison during this "interview." The only statements that Harrison made during this "interview" was that he "didn't say anything," yet he admitted to Thomas that he had called Jackson and Hayes "nappy headed."

In *Hathaway v. Runyon*, 132 F.3d 1214, 1223 (8th Cir. 1997), the jury returned a verdict in Hathaway's favor, finding that management had failed to implement proper remedial action. According to the Eighth Circuit, "[t]he jury apparently did not credit testimony by defense witnesses that management conducted a complete investigation into Hathaway's complaint.  No investigation was initiated by the EEO office until Hathaway's second request for assistance." *Id.* at 1223-24. In reinstating the jury verdict for Hathaway, the Eighth Circuit emphasized that the jury could have concluded that the management's response was insufficiently thorough and not conducted in good faith.  *Id.* at 1224.  In response to the employer's assertion that Hathaway's allegations were uncorroborated, the Eighth Circuit noted that "[i]t is not a remedy for the employer to do nothing simply because the coworker denies that the harassment occurred" and "an employer may take

35

remedial action even where a complaint is uncorroborated." *Id.*

Here, Harrison admitted to Laroy Thomas uttering the racially derogatory remark to Jackson and Hayes. Despite Harrison's admission, Laroy Thomas' failure to properly interview Hayes and Abbott, and his failure to interview Jackson, could lead a reasonable fact finder to conclude that this was a wholly deficient "investigation" and the Company failed to take appropriate remedial action in response to Jackson's complaints.

There is also a question whether Defendant's refusal to impose any disciplinary action upon Harrison following its investigation is reflective of its failure to take prompt remedial action. *See Yamaguchi v. United States Dep't of the Air Force*, 109 F.3d 1475, 1483 (9th Cir. 1997)(finding a factual dispute as to whether failure to discipline the harasser rendered employer's response inadequate despite the fact that the harassment stopped). During Laroy Thomas' investigation, Hayes told Thomas that Harrison had called him racial slurs, including "Black nappy-headed son-of-a-bitch," and "Black nappy-head." He may have told Thomas that Harrison had called him "nigger." Harrison admitted to Thomas during this investigation that he had called Jackson and Hayes "nappy-headed," a term that Thomas testified could be construed as a racial slur. Despite acknowledging a "racial component" to Jackson's and Hayes' complaints, Thomas never disciplined Harrison.  He never warned, suspended, reduced his pay, or transferred him to another job site.  Nothing was ever placed in Harrison's personnel file reflecting that racial complaints had been made against him and that any further incidents could warrant disciplinary action, including termination. *See Waltman v. Int'l Paper Co.*, 875 F.2d 468, 479 (5th Cir. 1989), *citing DeGrace v. Rumsfeld*, 614 F.2d 796, 805 n. 5 (1st Cir. 1980)(The court concluded that "more than mere verbal chastisements of those employees who used racial epithets was needed in order for [the defendant] forcefully to convey the

36

message that racism would not be tolerated.").

Without interviewing Jackson in conjunction with his harassment complaint, Laroy Thomas made the decision to transfer Jackson to a different job site. Harrison was never transferred to another project. Plaintiff submits evidence showing Laroy Thomas promoted Harrison to a position supervising not one job site, but all job sites, after the complaint of racial harassment had been made against Harrison.  Laroy Thomas subsequently promoted Harrison to a job that made him the fourth most senior employee in the Company, after President, Vice-President, and General Superintendent. After this promotion, Harrison was in charge of overseeing multiple projects and supervising all the Sheet Metal Job Superintendents responsible for their respective projects.

Plaintiff further submits evidence regarding Defendant's decision to transfer Jackson back to the Mt. Pleasant project to work under Harrison after the harassment had occurred. An employer has not taken appropriate remedial action if the plaintiff can show that the employer's response was not "reasonably calculated" to halt the harassment. *See e.g., Skidmore*, 188 F.3d at 615. Determinative of whether an employer's actions were remedial is whether the offending behavior in fact ceased. *See Indest v. Freeman Decorating, Inc.*, 164 F.3d 258, 266 (5th Cir. 1999)("Where the company, on hearing a plaintiff's complaint about inappropriate . . . behavior, moves promptly to investigate and stop the harassment, it eradicates any semblance of authority the harasser might otherwise have possessed).

Here, Defendant reassigned Jackson back to the Mt. Pleasant project in late December 2004/early January 2005. The transfer took place approximately four months after Jackson's and Hayes' complaints of Harrison's racial harassment were investigated by Laroy Thomas. Despite

37

Laroy Thomas' acknowledging a racial component to the situation to which Harrison had subjected Jackson and Hayes at Mt. Pleasant and despite Harrison's admission that he used remarks that Laroy Thomas later testified could be construed as racial slurs, Jackson was placed back into an environment in which he, once again, had daily contact with the alleged harasser. Because Harrison oversaw this project, he would visit it on a daily basis and have contact with Jackson whenever he visited. During these visits, the evidence shows Harrison would call Jackson racial slurs, including "Black nappy-headed son-of-a-bitch" and "Black son-of-a-bitch."

Based on the aforementioned evidence, the Court is of the opinion genuine issues of material fact exist on whether Defendant's actions were effectively remedial and prompt.  Defendant's motion for summary judgment is denied.

In his response to Defendant's motion for summary judgment, Plaintiff requests the Court rule that, in the event Plaintiff prevails at trial on the merits of his racial harassment claim, Defendant is liable for Harrison's harassment.  Specifically, in this regard, Plaintiff asserts because Harrison is a supervisor, the burden is on Defendant to prove it is not liable for the alleged harassment of Harrison.  According to Plaintiff, Defendant has failed to meet its burden on both prongs of the *Ellerth/Faragher* affirmative defense.  Clearly, Defendant bears the burden on this affirmative defense, but wether it has met this burden is not properly before the Court.  Resolution of the adequacy of the Defendant's investigation and the reasonableness of Jackson's actions will be reserved for trial. At present, there is no basis upon which to decide these issues as a matter of law. Based on the foregoing, it is

**ORDERED** that Defendant's Motion and Notice of Motion for Summary Judgment (Docket

Entry # 27) is hereby **DENIED**.

**SIGNED this 14th day of July, 2006.**


CAROLINE M. CRAVEN
UNITED STATES MAGISTRATE JUDGE